UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

KY C. QUAN,

    Plaintiff,

v.

TAB GHA F&B, INC.,
I.L. CREATION OF MARYLAND, INC.
*d/b/a I.L. Creations*,
STEVE P. CHOI and
MATTHEW S. YOO,

    Defendants.

Civil Action No. TDC-18-3397

**MEMORANDUM OPINION**

Plaintiff Ky C. Quan has filed suit against Defendants TAB GHA F&B, Inc. ("TAB"), I.L. Creation of Maryland, Inc. ("I.L. Creations"), Steve P. Choi, and Matthew S. Yoo asserting various contract and tort claims stemming from an agreement under which he provided capital to TAB in exchange for an equity interest in the company. Defendants have filed a Motion to Dismiss the Amended Complaint, which Quan opposes. The Court has reviewed the pleading and the briefs and finds no hearing necessary. D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

In October 2015, Quan began discussions with Ken Choi, the President of TAB, about the possibility of investing in TAB, which was in the midst of developing and expanding the "B | BOP | Q" chain of restaurants. Quan was aware that B | BOP | Q—both its food and the concept—had been developed in conjunction with staff from I.L. Creations, which owned and

operated various food courts in the Washington, D.C. metropolitan area. As part of those negotiations, Ken Choi represented to Quan that B | BOP | Q would soon be expanding into California and Hawaii, and that it was supported by I.L. Creations, whose annual revenue was approximately $300 million.

Based on Ken Choi's representations, particularly his assertion that B | BOP | Q was in a financial position to expand into California and Hawaii, Quan began negotiating a contract with TAB for Quan's investment in B | BOP | Q. By mid-November 2015, the parties had tentatively agreed that Quan would invest $1,000,000 in TAB in exchange for a five percent equity interest in the company. Matthew Yoo, a Senior Vice President of I.L. Creations, was actively involved in negotiating the terms of the contract, and Steve Choi, Chief Executive Officer of I.L. Creations and Ken Choi's brother, was included on at least some of the correspondence as to the contract terms.

On December 16, 2015, Quan, TAB, and TAB's shareholders—Ken Choi, Eunice Choi, and Christine Choi—executed a Stock Purchase and Interim Stockholders' Agreement ("the Agreement"), which Quan has attached to the Complaint. The terms of the Agreement required Quan to make two payments of $500,000, the first on December 18, 2015, designated as the "Initial Closing Date," and the second on February 29, 2016, designated as the "Final Closing Date." Agreement ¶ 2.3, Compl. Ex. A, ECF No. 24-1. TAB, in turn, was required on the Initial Closing Date to transfer to Quan one-half of the five percent equity interest, represented by 25 shares of TAB common stock and provided in the form of stock certificates. Quan's remaining equity interest was to be transferred on the Final Closing Date.

The Agreement contained two provisions referencing termination. The first, following directly after the provisions setting forth the requirements for transfer and closing, provided that:

> Termination Prior to Final Closing. In the event of termination of this Agreement prior to the Final Closing Date, Company agrees to promptly reimburse Buyer any portion of the Purchase Price paid by the Buyer under this Agreement as of the date of termination and, upon receipt thereof, Buyer agrees to promptly transfer back to Company any stock delivered to Buyer under this Agreement as of same date of termination.

Agreement § 2.5. The second provision stated that:

> Termination: This Agreement may be terminated at any time prior to the Final Closing Date, notwithstanding approval thereof by the Stockholders:
>
> (a) By mutual consent of Buyer and the Stockholders; or
>
> (b) By either Buyer or the Stockholders if the Acquisition shall not have been consummated by [DATE] (provided that the right to terminate this Agreement under this Section shall not be available to a Party whose failure to fulfill any obligation under this Agreement has been the cause of or resulted in the failure of the Acquisition to occur on or before such date); or
>
> (c) By either Buyer or the Stockholders if a governmental authority shall have issued a nonappealable final order, decree or ruling or taken any other action having the effect of permanently restraining, enjoining or otherwise prohibiting the Acquisition.

Agreement § 11.1.

On December 18, 2015, Quan wired his first $500,000 payment to TAB. On December 30, 2015, Yoo emailed him a scanned copy of a stock certificate. Yoo stated that he had the original stock certificate at his office and would be mailing it to Quan. Quan never received the certificate.

In January 2016, Ken Choi informed Quan that B | BOP | Q would not be expanding into California or Hawaii as planned, and in February 2016, Quan learned that Steve Choi instead intended to open a B | BOP | Q location in Brazil. To facilitate that plan, Steve Choi demanded early payment of Quan's second $500,000 installment. Quan became concerned about TAB's financial situation, as he had understood that it had full funding for the California and Hawaii expansion. In light of his concerns, on February 28, 2016, Quan provided written notice, attached

to an email to Ken Choi, that he was terminating the Agreement. Quan explained that although he was terminating the original contract, he remained open to negotiating a new agreement on new terms.

Over the ensuing seven months, the parties engaged in discussions about a new contract. However, in September 2016, Ken Choi informed Quan that none of B | BOP | Q's planned expansions—into California, Hawaii, or Brazil—would take place, nor would TAB be moving forward with any other B | BOP | Q expansions. At that point, Ken Choi agreed to return Quan's $500,000 payment.

Despite Ken Choi's promise of repayment, Quan learned through subsequent email exchanges that the issue of the reimbursement was being handled by Steve Choi and Yoo. In an October 27, 2016 email from Yoo to Quan on which Steve Choi was copied, Yoo informed Quan that he and Steve Choi did not believe that Quan was entitled to return of his $500,000 based on the terms of the Agreement, but "Mr. Choi feels a sense of moral duty and responsibility to you and feels that we should pay the money back." Compl. ¶ 45, ECF No. 24. Yoo explained, however, that "we do not have the funds to return to you," and "[w]e will need time to raise the funds." *Id.* He represented that "[w]e will try our best to return ½ of [the] funds or $250,000 within the next 12 months and the balance following the 12 month period." *Id.* Yoo's signature block included his I.L. Creations title of Senior Vice President. Based on Yoo's representations, Quan refrained from demanding immediate return of his $500,000 and did not demand interest on that sum.

On October 3, 2017, after learning that Ken Choi had been removed as President of TAB by Steve Choi, Quan emailed Yoo and Steve Choi to ask about the status of the repayment. The parties exchanged emails for several months. Finally, in a phone call on January 29, 2018, Yoo told Quan that he and Steve Choi believed that Quan was not guaranteed repayment under the

Agreement. Meanwhile, Quan learned that previously established B | BOP | Q locations were also being closed. After the January 2018 conversation, Yoo and Steve Choi failed to respond to Quan's subsequent requests for updates and repayment. To date, Quan has not been reimbursed any of the $500,000 he paid to TAB.

On November 2, 2018, Quan filed suit in this Court. On April 29, 2019, he filed an Amended Complaint asserting six causes of action: (I) breach of contract against TAB, based on a breach of the Agreement; (II) breach of contract against I.L. Creations, based on a breach of the October 27, 2016 email promise to reimburse him; (III) tortious interference with contract against I.L. Creations, Yoo, and Steve Choi; (IV) fraudulent inducement against all Defendants; (V) fraudulent misrepresentation against all Defendants; and (VI) unjust enrichment against TAB and I.L. Creations.

## DISCUSSION

Defendants have filed a Motion to Dismiss in which they assert that the Amended Complaint fails to state a claim on which relief can be granted. As to Count I, Defendants primarily argue that TAB's failure to repay Quan's $500,000 investment did not breach the Agreement because Quan had no right to unilaterally terminate the Agreement. As to Count II, Defendants primarily argue that the claim is barred by the Statue of Frauds. As to Counts III–V, Defendants generally assert that Quan fails to allege sufficient facts to support his claims, including under the heightened pleading standard for the fraud counts. As to Count VI, Defendants assert that no claim for unjust enrichment will lie when the rights of the parties as to the issue in contention are governed by an express contract.

I.  **Legal Standard**

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

In addition, because Quan's allegations in Counts IV and V sound in fraud, he is subject to the heightened pleading standards of Rule 9(b) for those counts. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Under this heightened pleading standard, Quan must allege "the time, place, and contents" of the fraudulent representation, the identity of the person who made the misrepresentation, and "what he obtained thereby." *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

II. **Breach of Contract**

In Count I, Quan alleges a breach of the Agreement because TAB did not return his $500,000 payment after he terminated the Agreement. Defendants assert that Quan's breach of contract claim fails because Quan had no right to unilaterally terminate the Agreement. Defendants assert that Quan improperly relies on section 2.5 of the Agreement, which generally provides that upon a termination before the "Final Closing," TAB was required to reimburse Quan for any payments already made, Agreement § 2.5, because the right to terminate in the first place

is governed by section 11.1. They argue that although section 11.1(a) permits termination upon mutual consent, there is no right to unilateral termination. Section 11.1(b), however, permits termination "[b]y either Buyer or the Stockholders if the Acquisition shall not have been consummated by [DATE]." Agreement § 11.1(b). Although section 11.1 generally allows termination only "prior to the Final Closing Date," the Agreement otherwise does not define the date referenced in section 11.1(b). *Id.* § 11.1. Nevertheless, Defendants argue that where no date was inserted, this provision is "convoluted and ambiguous" and effectively argue that it should therefore be ignored. Mot. Dismiss at 6, ECF No. 30.

In Maryland, courts follow "the law of objective contract interpretation, which provides that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (internal citations omitted). Where a contract's language is ambiguous, "extrinsic evidence may be consulted to determine the intention of the parties." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985). Moreover, "[i]n the absence of an express agreement to perform within a certain time, a reasonable time will be implied," after the court considers "the circumstances and conditions affecting the parties at the time, and their subsequent conduct and construction of the contract." *Anne Arundel Cty v. Crofton Corp.*, 410 A.2d 228, 232 (Md. 1980).

Here, where even Defendants acknowledge that section 11.1(b) is ambiguous, the solution is not to ignore it, but to accept extrinsic evidence on the question of the parties' intent as to that provision and potentially a reasonable date by which termination needed to occur. *See Pac Indem*, 488 A. 2d at 489; *see Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008) ("Effect must be given to

7

each clause [of a contract] so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." (citation omitted)). Because such extrinsic facts lie outside of the Amended Complaint and must be developed in discovery, Defendants' Motion as to Count I will be denied. *See Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) ("[T]he construct of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.")..

As to Count II, Quan alleges that the October 27, 2016 email in which Yoo stated, "We will try our best to return ½ of the funds or $250,000 within the next 12 months and the balance following the 12 month period" constituted an offer that he accepted, and that the failure to make such payments constituted a breach of the contract. Defendants argue that the breach of contract claim in Count II must fail because this alleged repayment agreement between I.L. Creations and Quan is barred by the Statute of Frauds. Defendants are incorrect.

Maryland's Statute of Frauds provides, in relevant part, that, "[u]nless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought [t]o charge a defendant on any special promise to answer for the debt, default, or miscarriage of another person." Md. Code Ann., Cts. & Jud. Proc. § 5-901(1) (West 2011). Emails can "constitute a sufficient writing under the Statute [of Frauds]," because "Maryland law recognizes that a series of communications can satisfy the Statute's requirements." *MEMC Elec. Materials Inc. v. BP Solar Int'l, Inc.*, 9 A.3d 508, 521 (Md. Ct. Spec. App. 2010). Here, Yoo's email was one in a months-long chain of emails between the parties. Where the alleged promise to repay was made as part of an on-going series of communications between Quan and Defendants,

the Statue of Frauds provides no basis to dismiss Count II. Although Defendants argue that Yoo's reference to trying "our best" signals that no firm promise to repay was made, such qualifying language does not preclude the existence of some kind of contractual promise that Quan has plausibly alleged was violated. The Motion will be denied as to Count II.

### III. Unjust Enrichment

As to Count VI, Defendants assert that in light of the existence of the Agreement, Quan cannot proceed on a claim for unjust enrichment. "[Q]uasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Com'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000). In such instances, the remedy for the injured party is to sue for breach of contract. *Id.* (stating that attempting to recover for a breach of contract through a quasi-contract claim amounts to "nothing more than a unilateral attempt to amend the agreement in a manner that the law does not allow").

Here, Quan asserts that Defendants have been unjustly enriched by his payment of $500,000 because "they have refused to honor their contractual obligations under [the Agreement]." Compl. ¶ 111. As to TAB, Quan's unjust enrichment claim cannot proceed because, as the Complaint itself makes clear, and the parties do not dispute, the relationship between the parties is governed by an express contract. To the extent that Quan believes that TAB breached the Agreement, his sole recourse is to sue for breach of contract.

As to I.L. Creations, however, the Court discerns no immediate impediment to Quan's unjust enrichment claim. I.L. Creations is not a signatory to the Agreement. There is thus no "express contract defining the rights and remedies of the parties" and therefore no danger that an unjust enrichment claim against I.L. Creations would unilaterally amend an otherwise mutual

agreement. *Com'rs of Caroline Cty.*, 747 A.2d at 610. Defendants' Motion will thus be granted on Count VI as to TAB but denied as to I.L. Creations.

**IV.    Remaining Claims**

As for the remaining claims, the bulk of Defendants' argument for dismissal is that Quan's Complaint fails to set forth sufficient allegations to state viable claims for relief for tortious interference with contract, fraudulent inducement, and fraudulent misrepresentations. Even applying the heightened pleading standard to the fraud claims, the Court finds this argument unpersuasive. Quan provides extensive detail about the genesis and contours of the business relationship between himself and Defendants, in particular by providing extensive information about the communications between the parties, including copies in the Complaint of many of the exchanged emails. Quan's Complaint is thus not the kind of "'naked assertion[]' devoid of 'further factual enhancement,'" that warrants dismissal. *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007)).

Where I.L. Creations, Yoo, and Steve Choi are not parties to the Agreement, and Quan has alleged that they intervened to block Ken Choi's initial decision to repay Quan his $500,000, Quan has plausibly alleged a claim for tortious interference with a contract in Count III. The claim that there are insufficient facts to support a finding of malice fails because at the pleading stage, state of mind may be alleged generally. *See* Fed. R. Civ. P. 9(b) (stating that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

Quan's Complaint is also sufficiently detailed to state plausible claims for fraudulent inducement (Count IV) and fraudulent misrepresentations (Count V). When Defendants have "been made aware of the particular circumstances for which [they] will have to prepare a defense at trial," and when "the plaintiff has substantial prediscovery evidence of those facts," courts

"should hesitate to dismiss a complaint under Rule 9(b)." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). These conditions exist here. Quan, with the assistance of extensive pre-discovery evidence in the form of emails, has identified in detail the circumstances surrounding his investment in B | BOP | Q as well as the circumstances surrounding his termination of the Agreement and his unsuccessful efforts to reclaim his $500,000 investment. Quan alleges that he was induced to enter into the Agreement by Ken Choi's representation, on behalf of TAB and during negotiations supported by the other Defendants, that funding had already been secured to expand B | BOP | Q into California and Hawaii, and where that representation proved to be incorrect, he has plausibly alleged fraudulent inducement. Likewise, he has plausibly alleged that the various promises and statements by Yoo, Steve Choi, and I.L. Creations, including that he would receive a legitimate stock certificate and that Defendants would make best efforts to repay the $500,000, were fraudulent misrepresentations particularly where in the end he received no stock certificate even for the value of his $500,000 payment, and he was never actually repaid. Under these circumstances, the general allegation of fraudulent intent is sufficient at the pleading stage. Fed. R. Civ. P. 9(b).

Finally, although Defendants make arguments in their reply brief about liability on the fraud counts for certain individual Defendants, "[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006). The Court will not address such claims or consider them as a basis to grant the Motion. In any event, the Court notes that the actual relationships between the individual Defendants and entity Defendants, and the specific roles that individuals played at various times, is insufficiently clear to allow the Court to

make firm determinations that would support dismissal of particular individual Defendants on particular counts at this time.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be GRANTED as to the unjust enrichment claim against TAB in Count VI, which will be DISMISSED WITH PREJUDICE as to TAB only. The Motion will be otherwise DENIED.

Date: January 23, 2020

THEODORE D. CHUANG
United States District Judge